**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA     :

v.                                          :          1:19-cr-00373 (TSC)

LOKESH NAIK                       :

**DEFENDANT'S MEMORANDUM IN OPPOSITION**
**TO GOVERNMENT'S REQUEST FOR DETENTION**

Based on an indictment charging two counts of Aggravated Sexual Abuse in violation of 18 U.S.C. § 2241 (a) and one count of Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(1), the government has requested pretrial detention of Mr. Lokesh Naik, pursuant to 18 U.S.C. § 3142(f)(1)(A) and 18 U.S.C. § 3142(f)(1)(B), asserting that there are no conditions or combination of conditions that will reasonably assure the safety of the community and that Mr. Naik is a serious flight risk. The government's request for pretrial detention must be denied because the government has not proven, by clear and convincing evidence that he poses a danger to the community and because the government cannot show, by clear and convincing evidence, that there are no conditions nor combination of conditions of release that will reasonably assure the safety of the community. In addition, the government has not proven, by preponderance of the evidence, that Mr. Naik is a serious flight risk.

**Introduction**

Mr. Lokesh Naik is a 35 year-old man who has spent the past ten years serving the U.S. military in Afghanistan. He has been employed by a military contractor called AECOM for

those ten years as a Maintenance Operator in various U.S. military bases in Afghanistan. Mr. Naik works in an administrative capacity for AECOM.[1]

In those ten years, Mr. Naik has developed into a valuable employee to AECOM and a well-loved friend to his colleagues, American and international, men and women.

Around the end of July to the beginning of August 2019, S.C., a maintenance contractor for AECOM arrived at Forward Operating Base ("FOB") Fenty, where Mr. Naik worked. S.C. had an office directly next to Mr. Naik's office. According to discovery, over the next two weeks, individuals observed S.C. in Mr. Naik's office on a frequent basis. Several individuals reported both that they appeared to be developing a close friendship and also that S.C. did not talk to many others on the base. Others noticed that the two would go to the gym together.

On August 7, 2019, Mr. Naik and S.C. made plans to socialize. That evening, they spent time together at the "Smoke Pit," an outdoor area with a picnic table, and were observed by other witnesses talking to each other. At some point, they decided to go to a room called the ESD room. S.C., in her work capacity, had a key to the otherwise padlocked room. They conversed with each other and drank alcohol that Mr. Naik had brought.

At this point, the accounts diverge substantially. S.C. claims that she told Mr. Naik that she wanted to go to bed. She reports that she went to her locked building and went to bed with her clothes on. She alleges that she woke up with Mr. Naik on top of her, trying to remove her clothing.

---

[1] AECOM is the company for which Mr. Naik is employed. ACFIRST apparently refers to the Army Field and Installation Readiness Support Team, a joint venture between the U.S. Army and AECOM for AECOM to provide maintenance and supply services to military bases in Afghanistan.

Mr. Naik, in a voluntary statement to investigators on the morning after the alleged incident, relayed that S.C. invited him back to her room to "cuddle." Once there, S.C. initiated sexual contact and the two had consensual sex.

At approximately 1 am, S.C. knocked on her neighbor's door and claimed that Mr. Naik had entered her room while she was sleeping and had sexually assaulted her. S.C. and the witness immediately reported the allegation to their supervisor. The supervisor, in turn, brought the complainant to the clinic on base. The clinic did not have a rape kit so S.C. was transported to Bagram Air Base. A thorough examination was conducted and no bruises, marks or abrasions were observed by the physician.

The following morning, Mr. Naik reported to his supervisor that he had consensual sex with S.C. He told the supervisor that S.C. had invited him to her room and that he had agreed. He stated that she propped open the door for him, told him her room number and that he had gone to her room. Once there, she initiated sex with him and they had consensual intercourse. On the same day – August 8, 2019, Mr. Naik reportedly consented to a search of his room, consented to providing his DNA, and agreed to take a polygraph examination. He met with investigators three times.

Individuals who have worked with Mr. Naik attest to his good character and nature. See Exhibit A. W1 describes him as "soft-spoken and gentle, and his respect for women has always been unmatched." Mr. Naik was a person known for spreading "nothing but encouragement and love." W2, his former boss when he worked in Kandahar, describes him as a "big brother" to some women and a "little brother" to others. She states that he "would go out of his way to help everyone… and would come to the aid of anyone, it didn't matter male or female." W3 describes Mr. Naik as "super loving, respectful, caring helpful and admirable in his actions

among other things; this was to women especially.  Kindness was always his motto, he respected women the same as he would do his mother and/or grandmother." Another superior, W4 describes him: "Never have me[t] a better person who would give you his last because he truly cared about people and he always treated people with the u[t]most respect."  Even the woman described as W2 in the government's pleading describes Mr. Naik as a "really nice" person.

Mr. Naik enjoys the same reputation for kindness back at home.  In India, his wife reports, he is known to go out of his way to help others.  In particular, he has worked towards feeding starving people in his community.  His wife also reports that he is a good person who is not violent.

## Argument

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). The Supreme Court has explained: "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); see also *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant."

Id. at 1405.

The government bears the burden of demonstrating, by clear and convincing evidence, that preventative detention is necessary to ensure the safety of the community. Although a rebuttable presumption applies here for detention, Mr. Naik's lack of criminal history and evidence of his good character rebut the presumption. In addition, the government must prove, by preponderance of the evidence, that Mr. Naik is a serious risk of flight. It has not.

> A. The Government has not proven, by clear and convincing evidence, that preventative detention is necessary to ensure the safety of the community.

Under the Bail Reform Act, the Court must consider the following factors when determining whether the government has set forth clear and convincing evidence that Mr. Naik be detained. They are: 1) the nature and circumstances of the offense charged; 2) the weight of the evidence; 3) the history and characteristics of the person charged; and 4) the nature and seriousness of the danger posed by the person to any person in the community if he is released. 18 U.S.C. 3142 (g).

Weighing all of these factors, this Court should release Mr. Naik.

> 1. Nature and Circumstances of the Offense Charged

The nature and circumstances of the offense charged weigh in favor of release. Mr. Naik is accused of an acquaintance rape of S.C. at a military base in Afghanistan. The allegation is limited to a singular act. While sexual assault has been considered a crime of violence, there is no separate allegation of assaultive behavior such as punching, kicking, or making any threats. There is no allegation that Mr. Naik used or even had a weapon. There is no allegation of any obstructive conduct after the fact. With the exception of this allegation, Mr. Naik has never been accused of assaulting a woman in any context. Given the allegation in this case, conditions to

stay away from the complainant is a sufficient condition to reasonably assure the Court of the safety of the community.

2. The weight of the evidence

A cursory review of the discovery provided thus far demonstrates that the weight of the evidence against Mr. Naik is exceptionally weak and favors release. In short, the investigation in this case shows that S.C.'s complaints are entirely uncorroborated and that she has made inexplicable and material inconsistent statements that wholly undermine her credibility.

First, the investigation reveals that S.C.'s allegations are uncorroborated in every important way. She alleges that her assailant had no weapon and acted through use of physical force – yet the forensic sexual assault examination revealed no injuries of any kind. The only marking observed in the examination were imprint's left by S.C.'s watch. In addition, agents observed that the walls of S.C.'s residence were exceptionally thin and canvassed neighbors for witnesses. Multiple witnesses reported that the walls were thin and that it was common to hear phone conversations, televisions and sexual intercourse through the walls. The agents spoke to a number of individuals who were awake at the time of the alleged assault and heard nothing.

In addition, S.C. had reported that the keycode into her building often did not latch as an explanation for Mr. Naik's ability to enter into her room without invitation or even her knowledge. In contrast, Mr. Naik plausibly explained to agents that S.C. had propped the door open for him and told him to join her in her room in five minutes. Agents found that the lock to the building was working properly.

S.C. has already made several significant inconsistent statements that substantially damage her credibility or reliability. S.C. initially reported that she went to sleep and woke up with Mr. Naik on top of her, attempting to take her clothes off. In later accounts, S.C. story

changed - she stated that she woke up to see Mr. Naik entering her room or by the door and then came towards her bed. S.C. also denied drinking alcohol in her initial reports to investigators and even in the forensic examination. She appeared to acknowledge that the false statement was intentional when she testified in the grand jury. In the same initial investigation, S.C. also omitted from her initial report her rendezvous with Mr. Naik in the locked and secluded ESD.

Other physical evidence undermines the government's case, where no physical evidence appears to support it. For example, Mr. Naik's watch and two rings were recovered from the dresser next to S.C.'s bed. There was no evidence recovered from S.C.'s or Mr. Naik's room that suggested a nonconsensual encounter.

Finally, Mr. Naik actions demonstrate a consistent consciousness of innocence. Mr. Naik has been cooperative since the inception of this investigation. He even offered to submit to a polygraph examination to Army investigators. He reportedly consented to all searches on the first day of the investigation.

In contrast, S.C., when making her initial report to her supervisors, requested that the matter be kept "in house." S.C. even offered to sign a memoranda attesting to her desire to limit access to her accusations to her supervisor. The supervisor refused and reported her allegations, ultimately resulting in the instant case.

   3. The history and characteristics of defendant.

The history and characteristics of defendant weigh heavily in support of release. Mr. Naik has no prior convictions or even arrests reported by Pretrial Services. He has been gainfully employed for at least the past ten years. He is supported by the community in Afghanistan – the individuals there report that he has never been violent and is respectful to women and men alike. He is known to be a "good guy," "compassionate" and "kind." He is further supported by his

family in India.  Apart from this allegation, the government has not proffered a single instance where Mr. Naik has been shown to be dangerous.

           4.   The Nature and Seriousness of the Danger to Any Person in the Community

Mr. Naik is not a danger to anyone in the community, with the arguable exception of the complaining witness.  Although he is accused of a serious offense, he maintains his innocence and is presumed innocent.  But even by the government's allegations, he is not alleged to have caused any injuries, to have attempted to obstruct justice or to threaten any witnesses in any way. Nothing in his history suggests he is a danger to anyone.  The Pretrial Services Agency agrees, finding him to be a low risk of global re-arrest. Mr. Naik will not oppose a stay-away order from the complainant to address any concerns that he may be a danger to her.

    B.  The government cannot show that Mr. Naik is a Serious Flight Risk

The government argues that Mr. Naik is a serious flight risk because he lacks ties to the United States.  ECF 4 at 12.  This argument falls well short of supporting "the conclusion that [Mr. Naik's] pretrial detention is necessary in order to assure his presence at trial."  *United States v. Nwokoro*, 651 F.3d 108, 110 (D.C. Cir 2011).

As in *Nwokoro*, Mr. Naik does not have the passport "much less resources within the United States [to give] him the unique ability to leave the United States." *Id.*  Although the U.S. Marshal Service gave counsel Mr. Naik's passport, he is willing to surrender his passport as a condition of release. In addition, Mr. Naik does not have the means to leave the United States. He was the sole breadwinner for his household – having no opportunity to work, Mr. Naik is indigent.  His family does not own property and does not have the assets to allow him to leave this country, even if he desired to do so.

Moreover, Mr. Naik has every incentive to stand trial and clear his name. The government's case is particularly weak and an acquittal is necessary for him to return to his job of ten years.  Mr. Naik and his family have made substantial personal sacrifices so that he could work in Afghanistan and support his family – he desperately wishes to return to his job so that he can resume his earnings – something that he cannot do without standing trial. Pretrial Services has also determined Mr. Naik to be a low risk to not return to Court.

C.  Placement

Counsel has spoken to a friend of Mr. Naik, Mr. Karlisha Thompson who is willing to accept responsibility for Mr. Naik. Mr. Thompson has offered to pay for lodging for Mr. Naik in Hinesville, Georgia, where Mr. Thompson resides.  If the Court requires that Mr. Naik not live alone, Mr. Thompson is currently making efforts to adjust his own living arrangements to accommodate Mr. Naik.

## Conclusion

Wherefore, for the foregoing reasons, the government has not met its burden of demonstrating that there no conditions or combination of conditions that will assure the safety of the community.  Nor has it demonstrated that Mr. Naik is a serious risk of flight.  Mr. Naik respectfully requests that the Court deny the government's motion.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500