UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| v. | : | Criminal No. 19-CR-373 (TSC) |
| | : | |
| LOKESH NAIK, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Defendant Lokesh Naik is an Indian national who works on a U.S. military operating base in Afghanistan. Naik is charged in an indictment with two counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(a) and one count of abusive sexual contact in violation of 18 U.S.C. § 2244(a)(1). (ECF No. 1 ("Indictment")).[1] Naik moves to dismiss the indictment, arguing that because he is a foreign national, prosecuting him for conduct that occurred outside the United States violates his due process rights, and that the Military Extraterritorial Jurisdiction Act is facially unconstitutional and unconstitutional as applied to him. (ECF No. 24 ("Def. Br.").) Upon consideration of Naik's motion to dismiss and the parties' briefs, and for the reasons stated below, the motion to dismiss will be DENIED.

### I. BACKGROUND

#### A. Factual Background

Naik is an Indian national who works on a U.S. military base ("FOB Fenty") in Afghanistan for a U.S. government contractor, Global Sourcing Solutions ("GSS"), which is

---

[1] On January 31, 2020, the court granted leave for the government to file a superseding indictment that will contain technical changes to the indictment. That superseding indictment has not yet been filed. However, the changes do not affect the court's opinion on the motion before it.

based in Dubai, United Arab Emirates.  GSS contracts with a U.S. prime contractor, AC First, LLC, to provide personnel so that AC First can, in turn, provide services to the U.S. military at FOB Fenty.  (ECF No. 24-2.)

GSS employs Naik as a maintenance operations specialist.  (ECF No. 24-1 ("GSS Empl. Contract") § 1.)   Naik's employment agreement requires him to comply with "U.S. government laws and regulations applicable to the contract and to contractor employees accompanying the forces or performing work on a military installation."  (*Id.* § 2.5.)  The agreement also requires him to "comply with personal industrial security regulations and directives issued by the U.S. government."  (*Id.*)  Naik also "acknowledges that the EMPLOYER'S contract is with the U.S. government or a prime contractor to the U.S. government and that EMPLOYER and EMPLOYEE are subject to the U.S. Government direction, authority, guidelines, and regulations to include the Uniform Code of Military Justice (UCMJ)."  (*Id.*)  Finally, the agreement states: "Any breach of [the following obligations] may result in the EMPLOYEE being immediately terminated for cause by the EMPLOYER . . . (e) failure to comply with the U.S. and/or local Government and/or EMPLOYER'S orders, regulations, directives, policies or procedures . . . (j) inappropriate personal conduct at any time that reflects unfavorably upon the U.S. Government, the Prime contractor or the employer . . . ."  (*Id.* § 7.3.)  In addition, all GSS employees, including Naik, are given "a copy of Joint Task Force-3 General Order Number 1" which "informs contractors employed by or accompanying the Armed Forces that they are subject to criminal prosecution" for violations of the policy, including sexual conduct and sexual harassment.  (ECF No. 38 ("Gov't Br.") at n.1, ECF No. 38-2 ("General Order") ¶¶ 4, 5(e).)

On August 8, 2019, S.C., another civilian employee on base, reported that Naik had sexually assaulted her.  A grand jury indicted Naik on November 6, 2019, and the U.S.

2

government took him into custody in Afghanistan in late November, and transferred him to the U.S. for prosecution. (Gov't Br. at 5.) Before this transfer, Naik had never been to the U.S. (Def. Br. at 2.)

**B. <u>Statutory Framework</u>**

Naik was transported to the U.S. for prosecution under the Military Extraterritorial Jurisdiction Act ("MEJA"), which gives the U.S. criminal jurisdiction over certain people working for or accompanying U.S. armed forces overseas:

> Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States . . . while employed by or accompanying the Armed Forces outside the United States . . . shall be punished as provided for that offense.

18 U.S.C. § 3261(a).

The statute defines "employed by" to include employees of Department of Defense subcontractors who are "present or residing outside the United States in connection with such employment" and are "not a national of or ordinarily resident in the host nation." 18 U.S.C. § 3267(a)(1)(A)(iii), (B), (C).

## II.  LEGAL STANDARD

A defendant may challenge "a defect in the indictment or information"—including its constitutionality—as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). A defendant may challenge a statute as unconstitutional on its face or as applied to the conduct alleged. *See Hodge v. Talkin,* 799 F.3d 1145, 1156–57 (D.C. Cir. 2015). In order to show that a statute is facially unconstitutional, a defendant must demonstrate that the statute is "unconstitutional in all of its applications." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1133 (D.C. Cir. 2017) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In

3

contrast, an as-applied challenge need only show that the statute is "an unconstitutional exercise of congressional power" as applied to the defendant. *United States v. Sullivan*, 451 F.3d 884, 887 (D.C. Cir. 2006). When ruling on a motion to dismiss an indictment, the district court assumes the truth of the factual allegations in the indictment and the government's proffered facts. *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

### III.   ANALYSIS

#### A. <u>Facial Challenge</u>

Congress passed the MEJA to fill a jurisdictional gap when host nations declined to prosecute civilians, foreign to the host nation, who committed crimes in the host nation while employed by or accompanying U.S. armed forces. H.R. Rep No. 106-778, pt.1 at 14 (2000) (explaining Congress intended to "amend Federal law to extend its criminal jurisdiction to persons, both United States citizens and foreign nationals, who commit criminal acts while employed by or otherwise accompanying U.S. Armed Forces outside the U.S."). Without the MEJA, the U.S. lacked the power to prosecute civilians for crimes committed while accompanying armed forces overseas. *See Kinsella v. Singleton*, 361 U.S. 234 (1960) (prohibiting use of military courts-martial for crimes allegedly committed by civilians accompanying armed forces overseas). Naik contends that the MEJA was an unconstitutional exercise of congressional authority because "nothing in the Constitution confers on Congress the power to police foreign nationals with respect to their alleged criminal acts outside the United States." (Def. Br. at 14.)

The MEJA is presumed constitutional. *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) ("[T]he judiciary must rightly presume that Congress acts consistent with its duty to uphold the Constitution."); *see also United States v. Knowles*, 197 F. Supp. 3d 143,

152 (D.D.C. 2016) ("The Court must presume that a federal statute is constitutional."). Notwithstanding this presumption, Congress's power to enact any law, including the MEJA, must derive from the Constitution. *United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."); *see also United States v. Carvajal*, 924 F. Supp. 2d 219, 249 (D.D.C. 2013) ("Because the powers of the legislature are defined and limited, every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution.") (citation and internal quotation marks omitted).

This court finds the Fourth Circuit's ruling on the MEJA's constitutionality in *United States v. Brehm*, 691 F.3d 547, 551 (4th Cir. 2012), persuasive. In *Brehm*, the Court held that as-applied, the MEJA was a constitutional exercise of Congress's express powers to "raise and support Armies." *Id.* (citing U.S. Const. art. I, § 8, cl. 12). The Court further held that the MEJA was a constitutional exercise of Congress's powers to "make all Laws which shall be necessary and proper" to support the armed forces, because it supports the armed forces' ability to operate abroad. *Id.* (citing U.S. Const. art. I, § 8, cl. 18; *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)).

This court agrees with *Brehm* and finds that the MEJA is a constitutional exercise of Congress's Article I powers. In passing the MEJA, Congress was exercising its broad authority to support and regulate U.S. military operations, U.S. Const. art. I, § 8, cl. 12, including civilians who are employed by or accompany the armed forces. *Brehm*, 691 F.3d at 551; *see also Rostker*, 453 U.S. at 65 ("This Court has consistently recognized Congress's broad constitutional power to raise and regulate armies and navies.") (internal quotation omitted)). The Necessary and Proper Clause also allows Congress to enact the MEJA because the Act is "rationally related to the implementation of a constitutionally enumerated power"—here, the power to "raise and

support armies." *United States v. Comstock*, 560 U.S. 126, 134 (2010) (citing *Sabri v. United States*, 541 U.S. 600, 605 (2004)). The MEJA is "reasonably adapted"—providing for specific criminal jurisdiction over a class of people—to the "attainment of a legitimate end"—supporting and regulating U.S. armed forces abroad. *Id.* As the Fourth Circuit explained in *Brehm*, "[a]rmies, by their very nature, must be expected to operate in foreign lands, and their need for support does not end at our borders." 691 F.3d at 551.

The court need not address whether the MEJA comports with the *Charming Betsy* canon (that an act of Congress should not be construed to violate international law if another construction is possible), because the MEJA explicitly applies extraterritorially. *See United States v. Ali*, 718 F.3d 929, 943 (D.C. Cir. 2013) (citing *Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804)).

### B. As-Applied Challenges

Naik contends that criminally prosecuting him in the U.S. for sexual abuse violates his right to due process because he does not have a sufficient connection to the U.S., and he had no notice that he could be prosecuted in the U.S. for sexual assault. (Def. Br. 8–13.) Naik further contends that the MEJA cannot apply to "foreign national employees of foreign private subcontracting companies in foreign countries accused of acquaintance rape." (Def. Br. at 21.) He argues that, in order to avoid ruling on the MEJA's constitutionality, the court should find the Act inapplicable here on due process grounds. (Def. Br. at 22.)

In *United States v. Ali,* the D.C. Circuit held that the "animating principle governing the due process limits of extraterritorial jurisdiction is the idea that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" 718 F.3d at 944 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964). The Court found that the

6

"'ultimate question' is whether 'application of the statute to the defendant [would] be arbitrary or fundamentally unfair.'" *Id.* (quoting *United States v. Juda*, 46 F.3d 961, 967 (9th Cir. 1995)). "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Id.* (quoting *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)). The Court cautioned that it "ha[d] not found []any case in which extraterritorial application of a federal criminal statute was actually deemed a due process violation. Although that does not mean such a result is beyond the realm of possibility, it does suggest [defendant's] burden is a heavy one, for he traverses uncharted territory." *Id.* at n.7.

Naik's prosecution under 18 U.S.C. §§ 2241 and 2244, which apply extraterritorially via the MEJA, satisfies due process. The defense argues that "acquaintance rape" is not the kind of offense that is so widely condemned such that the defendant would be on notice that he could be prosecuted anywhere. (Def. Br. at 12.) This argument is unpersuasive. The U.S., Afghanistan, and India—countries with a plausible interest in this prosecution—all proscribe sexual assault. Article 375 of the Penal Code of India criminalizes rape, which is defined as "sexual intercourse with a woman . . . against her will [or] without her consent," and is punishable by no less than seven years. (ECF No. 38-6 (excerpt of Penal Code of India).) In Afghanistan, Article 636 of the Penal Code criminalizes sexual intercourse by force, threat, or other intimidating means, and those convicted are subject to a "long prison term." (ECF No. 38-7 (excerpt of Penal Code of Afghanistan).) Naik therefore should have "reasonably [understood] that his conduct [i.e., alleged sexual assault] was criminal and would subject [him] to prosecution somewhere." *Ali*, 718 F.3d at 944. To the extent Naik intends to distinguish between sexual assault of an

7

"acquaintance," as opposed to a stranger, such a distinction is not found in the laws of Afghanistan or India. Indeed, sexual assault—throughout the world—commonly occurs at the hands of friends, family members, and partners.

Naik also argues that he lacks a sufficient nexus with the U.S. to satisfy due process, because he is a foreign national working for a foreign subcontractor. The D.C. Circuit clarified in *Ali* that the nexus requirement serves a limited purpose in a due process inquiry into the extraterritorial effect of criminal laws: "[I]t addresses the broader concern of ensuring that 'a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country.'" 718 F.3d at 944 (quoting *United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998)).

Naik has a sufficient nexus with the U.S. such that he could "reasonably anticipate being haled into court in this country." *Id.* He has worked as a subcontractor for the U.S. Department of Defense on U.S. military installations for over ten years. Contrary to Naik's assertion, the distinction between subcontractor and prime contractor here is irrelevant where his contract put him on notice that he was subject to U.S. law: "EMPLOYER and EMPLOYEE are subject to the U.S. Government direction, authority, guidelines, and regulations to include the Uniform Code of Military Justice (UCMJ)." (GSS Empl. Contract § 2.5.) Further, Naik received the General Order informing him that he is subject to criminal prosecution in the United States for violations of the policy, which governs sexual conduct and sexual harassment. (General Order ¶¶ 4, 5(e).) While these provisions are not as clear as those in *Brehm*, where the defendant's contract specifically referenced possible prosecution in the United States under the MEJA, 691 F.3d at 549, the provisions in Naik's employment contract and the General Order put him on notice that his conduct was regulated by the U.S. and that he could be prosecuted in the U.S. Taken

together, these facts show that Naik had a sufficient nexus with the United States to reasonably expect to face prosecution here for sexual assault.

Naik further contends that the alleged conduct did not interfere with any significant U.S. interest, and that Afghanistan has not disclaimed any interest in the prosecution. (Def. Br. at 10–11.) These arguments are unpersuasive. The U.S. has a significant interest in regulating criminal conduct by civilians on its foreign military bases. *See Brehm*, 691 F.3d at 552 (explaining the significant U.S. interests included "preservation of law and order on the base" and "the maintenance of military-related discipline"). This interest is not lessened when the host country also has the authority to prosecute. The treaty between the U.S. and Afghanistan permits Afghanistan to prosecute contractor employees, but it does not confer exclusive jurisdiction over contractor employees to Afghanistan. (*See* ECF No. 38-3 (Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America, art. III, cl. 6 (Sept. 30, 2014) ("Afghanistan maintains the right to exercise jurisdiction over United States contractors and United States contractor employees.")).) Here, according to the government's investigative report, Afghanistan chose not to assert its jurisdiction over the Defendant on September 12, 2019. (ECF No. 38-4.)

Therefore, the court finds that Naik could "reasonably anticipate being haled into U.S. court," *Ali*, 718 F.3d at 944, for sexual assault and the prosecution for the alleged conduct is not arbitrary or unfair.

### IV. CONCLUSION

Accordingly, the motion to dismiss will be DENIED. A corresponding Order will issue separately.

Date: February 2, 2020

_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge