UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 19-CR-373 (TSC) |
| : | |
| LOKESH NAIK, : | |
| : | |
| Defendant. : | |

# MEMORANDUM OPINION

Defendant Lokesh Naik is charged in an indictment with two counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(a) and one count of abusive sexual contact in violation of 18 U.S.C. § 2244(a)(1). (ECF No. 1 ("Indictment")).[1] Naik moves to suppress statements he made to Army Criminal Investigative Division agents on August 9 and 14, 2019, and on October 3, 2019, arguing they were involuntary and made in violation of his *Miranda* rights. (ECF No. 23 ("Def. Br.").)[2]

The court held an evidentiary hearing on January 31, 2020, on the motion to suppress and other motions. The court heard testimony from three military criminal investigation agents involved in Naik's questioning and entered into evidence the video recordings of Naik's three statements. Based on that testimony and the entire evidentiary record, and for the following reasons, the court will GRANT in part and DENY in part Defendant's motion to suppress.

---

[1] On January 31, 2020, the court granted leave for the government to file a superseding indictment that will contain technical changes to the indictment. That superseding indictment has not yet been filed. However, the changes do not affect the court's opinion on the motion before it.

[2] Naik initially filed the motion to suppress on January 3, 2020, ECF No. 19. Because that motion mentioned the complainant's full name, the parties agreed to seal the motion and the defense filed a redacted version on the public docket, ECF No. 23. All references to Naik's motion refer to the public version.

## I. FACTUAL FINDINGS

The court found the military investigators who testified at the motions hearing, Yring Richardson, Ansuman Baral, and Kyle Zimmerman, to be credible witnesses.

### A. Naik's Personal Background

Naik is an Indian national who has worked on U.S. military operating bases in Afghanistan for approximately ten years. (ECF No. 61 ("Def. Reply") at 1.)[3] At the time of the alleged sexual assault, Naik was working at a military base in Jalalabad, Afghanistan, FOB Fenty, for Global Sourcing Solutions, a subcontractor with the U.S. Department of Defense.

Naik's native language is Hindi. He learned English while working on base. Hr'g Tr. 57:4–12, 58:20–22 (Jan. 31, 2020) (Testimony of Agent Baral).[4] He has two years of college education. (Def. Reply at 1.) Until his transfer to the United States for this prosecution, Naik had never been to the United States or had any experience with its criminal justice system. (*Id.*)

### B. August 9, 2019 Statement

On August 9, 2019, Naik's supervisor transported Naik across FOB Fenty to "EDOC," where Agents Richardson and Steele questioned him. Hr'g Tr. 18:5–17 (Testimony of Agent Richardson). When he arrived, Naik was instructed to empty his pockets and was searched. *Id.* at 19:8–14. Agent Richardson escorted Naik to the interview room, without touching him. *Id.* at 19:13–21. Neither agent was wearing a badge, and both were in civilian clothes. *Id.* at 19:22–24; 21:10. Both agents had guns in hip holsters, which were covered by their shirts; neither agent ever unholstered their gun. *Id.* at 20:1–9; 21:14–20.

---

[3] The court cites to the Defendant's brief only for facts that the government did not contest, and which the court therefore accepts as true.
[4] Transcript cites are to the draft transcript the court saved immediately after the hearing. These cites will be updated when the court and parties receive a final copy of the transcript.

Richardson initially testified that Naik was free to refuse to answer questions. She then testified, after being asked whether he could have refused to come in for questioning, that "we usually ask them to come and at least talk to us, and then he can say no at any point." *Id.* at 20:15–20.

The agents then asked Naik for information for an administrative form and chatted with him about his day. *Id.* at 20:21–21:3. Then they went over his rights. First, Agent Richardson explained to Naik that he was suspected, not accused, of the following offenses: failure to obey an order, sexual assault, offense concerning a government computer, and burglary. Def. Ex. 1 (Video Recording of August 9, 2019, Interview ("Aug. 9 Video") at 12:40–41 a.m.). Naik asked the agent to explain the burglary charge; she did so. *Id.* Agent Richardson directed Naik to cross out the word "accused" on the form, so that it read only that he was "suspected," and to initial the change. *Id.* Naik complied. *Id.* Agent Richardson then read the provisions on the form stating that Naik had the right to remain silent and that his statements could be used against him as evidence in a criminal trial. Naik confirmed he understood each of these rights. *Id.*

Agent Richardson then informed Naik of his right to counsel: "I have a right to talk privately to a lawyer before[] during, and after questioning and have a lawyer present with me during questioning. I understand that this lawyer can be one that I arrange for at my own expense or if I cannot afford a lawyer, and want one, a lawyer will be appointed to me before any questioning begins." *Id.* at 12:41–42 a.m. She then asked whether Naik understood, and he said "yes." *Id.* Agent Richardson then directed Naik to initial each of the three rights they had just discussed. *Id.* at 12:42 a.m. Naik then said, "let me tell you right now ma'am, I cannot afford no lawyers right now because I don't have one." *Id.* at 12:43 a.m. Agent Richardson said "ok," and informed Naik of a fourth right, that he could cease questioning at any time or that he could talk

to a lawyer at any time despite waiving the other rights. *Id.* She asked if he understood, and Naik responded "yes, that I am telling you the information without a lawyer." *Id.* Agent Richardson replied, "ok that's fine." *Id.*

Agent Richardson then asked whether Naik had been read his rights before or seen the waiver form, and he responded that this was the first time he had seen the form. *Id.* Agent Richardson asked if Naik was willing to speak to the agents now, and he said, "yes ma'am." *Id.* Then both Naik and Agent Richardson signed the waiver form. *Id.* at 12:44; Gov't Ex. 3 (Waiver Form dated Aug. 9, 2019).

Approximately six minutes later, Agent Richardson asked for Naik's consent to a search of his room. Aug. 9 Video at 12:50 a.m. The following exchange ensued:

- Naik: "But, like, I'm an Indian, how can I get a lawyer when I'm here? Can I go home?"

- Agent Richardson: "I can't give you legal advice, I can just tell you that you are within your means to get a lawyer."

- Naik: "I has to?"

- Agent Richardson: "It's up to you. It's totally up to you. That's why I read you your rights."

- Naik: "I don't have nobody ma'am. I don't have nobody. I don't have like enough money to pay a lawyer. Because I'm Indian. I get paid like 1,200 something."

- Agent Richardson: "I understand."

- Naik: "I cannot afford a lawyer ma'am."

- Agent Richardson: "I mean that's kind of why we go over your rights. This is your opportunity for us to hear your side of the story on things. Um, but, you know, ultimately things are up to you in regards to, you know, talking."

- Naik: "But, like, can I go home?"

- Agent Richardson: "After this? Yeah. You will go home. Give me one second."

4

*Id.* at 12:50–51.

Agent Richardson returned to discussing the forms to search Naik's room, and then began questioning him about the events of August 7. *Id.* The questioning lasted approximately two hours. *Id.* at 25:19–20.

    C. **Statement on August 14, 2019**

On August 14, 2019, Naik's supervisor again drove him across FOB Fenty to "EDOC," where Agent Baral questioned him. Hr'g Tr. 54:5–13 (Testimony of Agent Baral). Agent Baral was dressed in civilian clothes and his badge was not visible. *Id.* at 54:1–7. He carried a gun on his hip, which was covered by his shirt; he never unholstered his gun during the interview. *Id.* at 54:8–15. Baral testified that Naik could have refused to talk but did not. *Id.* at 54:18–21.

Agent Baral advised Naik of his "31 Bravo" rights (the military equivalent of *Miranda* rights) and walked him through a waiver form. *Id.* at 57:9–25. Agent Baral testified that the "31 Bravo" rights provide more protection to a suspect than the standard *Miranda* rights. *Id.* Agent Baral explained that Naik was suspected, not accused, of the following offenses: sexual assault, false official statement, burglary, and failure to obey an order. Def. Ex. 2 (Video Recording of August 14, 2019, Interview ("Aug. 14 Video") at 2:01–2 p.m.). He directed Naik to cross out the word "accused" and initial the change. *Id.* at 2:01 p.m. Agent Baral explained to Naik that he had the right to remain silent and that what he said could be used against him as evidence in a criminal trial. *Id.* at 2:03. Naik confirmed he understood each of these rights. Agent Baral then explained to Naik that he had a right to a lawyer and that if he could not afford one, a military lawyer could be assigned to him. *Id.* at 2:04 p.m. Naik confirmed he understood and asked no questions. Agent Baral told Naik he had a right to stop answering questions or consult with a lawyer even if he waived his rights. *Id.* at 2:04 p.m. Then both Naik and Agent Baral signed the waiver form. Gov't Ex. 4 (Waiver Form dated Aug. 14, 2019).

5

The questioning lasted approximately 5 hours and forty minutes. Hr'g Tr. at 66:14–16 (Testimony of Agent Baral). The room was air conditioned but remained hot because it was approximately 120 degrees outside. *Id.* at 66:19–23. Agent Baral took several breaks and provided Naik with water. *Id.* at 59:25–60:11. Baral ended the questioning and gave Naik food when he said he was hungry. *Id.* at 60:18–23.

Agent Baral testified that he told Naik that other people had heard the complainant tell Naik "no" multiple times during the alleged sexual assault. *Id.* at 67:17–24. This was false; Baral testified that he made a strategic decision to lie to Naik about this evidence to pressure him into telling the truth. *Id.* at 67:23–68:16. After Baral repeatedly confronted Naik with this claim for two and a half hours, raising his voice and getting closer to Naik, Naik told Baral that the complainant had said no. *Id.* at 71:25–72:3; 72:24–73:4. Agent Baral also accused Naik of "grooming" the complainant "like a child molester" because Naik had been nice to her before the alleged sexual assault. *Id.* at 73:22–74:2. Agent Baral also called Naik a "predator." *Id.* at 7:4:3–4.

### D. <u>Statement on October 3, 2019</u>

On October 3, 2019, Naik's supervisor drove him, for the third time, across FOB Fenty to "EDOC," where Agents Zimmerman and Probst questioned him. Hr'g Tr. 77:6–11 (Testimony of Agent Zimmerman). Both agents were dressed in civilian clothes and did not have badges. *Id.* at 77:11–19. Both agents carried guns, in their holsters, which were not visible. *Id.* at 77:20–25. Zimmerman testified that Naik could have refused to talk but did not. *Id.* at 78:7–10.

Agent Zimmerman advised Naik of his *Miranda* rights and walked him through a waiver form. *Id.* at 81:1–12. Agent Zimmerman again explained that Naik was suspected, not accused, of the following offenses: sexual assault, false official statement, burglary, and failure to obey an

6

order. Def. Ex. 3 (Video Recording of Oct. 3, 2019, Interview ("Oct. 3 Video") at 8:03 p.m.). Agent Zimmerman crossed out the word "accused" and directed Naik to initial the change. *Id.* at 8:03 p.m. Agent Zimmerman then told Naik he had a right to remain silent, that what he said could be used against him as evidence in a criminal trial, that he had a right to a lawyer and a lawyer could be appointed for him if he could not afford one, and that he had the right to stop answering questions or consult with a lawyer even if he waived his rights. *Id.* at 8:04–6 p.m. Naik confirmed he understood each of these rights and placed his initials next to each right. *Id.* Agent Zimmerman asked if Naik "fully understood his rights" and Naik said he did. *Id.* at 8:06 p.m. Naik confirmed that he was willing to talk to Agent Zimmerman without a lawyer. *Id.* Naik, Agent Zimmerman, and Agent Probst all signed the waiver form. Gov't Ex. 5 (Waiver Form dated Oct. 3, 2019).

The agents questioned Naik for approximately 22 minutes, with no breaks. Hr'g Tr. at 82:18-19 (Testimony of Agent Zimmerman). Naik was given a bottle of water. *Id.* at 82:20–83:2.

## II. ANALYSIS

"*Miranda v. Arizona*, of course, safeguards [suspects'] Fifth Amendment right against self-incrimination by requiring law enforcement to advise them of their rights to silence and an attorney, and by limiting the government's use at trial of statements obtained in 'unwarned' interrogations." *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 60 (D.D.C. 2017) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)).

### A. **Custody**

For *Miranda* protections to attach, the defendant's statements must be made during custodial interrogation.[5] The D.C. Circuit has held there are two components to the *Miranda* custody analysis. First, the court must determine "whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Hallford*, 756 F. App'x 1, 6 (D.C. Cir. 2018) (citing *Howes v. Fields*, 565 U.S. 499, 509 (2012)). This is an objective inquiry, so the "subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." *Id.* (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011)). "A finding of Miranda custody is more likely, for example, when the questioned individual did not 'come voluntarily' or otherwise 'invite' or 'consent' to the interview at issue." *United States v. Hallford*, 280 F. Supp. 3d 170, 179 (D.D.C. 2017), aff'd, 756 F. App'x 1 (D.C. Cir. 2018) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004)). Other relevant factors include the "location, duration, and manner" of the questioning, whether the suspect is physically restrained, whether the agents are armed, and whether the suspected is isolated. *Id.* (citing *Fields*, 565 U.S. at 509).

The court finds that, under the circumstances of the questioning on all three days, "a reasonable person would have felt that [he] was not at liberty to terminate the interrogation and leave." *See Hallford*, 756 F. App'x at 6. Naik is an Indian national who is unfamiliar with the U.S. justice system. Naik's supervisor drove him to and from each interrogation, during which he was questioned by armed agents. The first interrogation lasted two hours, the second over

---

[5] The government does not dispute that the questioning was an interrogation. (*See* ECF No. 29 ("Gov't Br.") at 4–13, ECF No. 79 ("Gov't. Surreply").)

five hours, and the third twenty minutes. While Naik was not restrained or under arrest, the agents informed him each time that he was a suspect in a criminal case and subjected him to accusatory questioning. Agents Richardson, Baral and Zimmerman testified that they believed Naik could end the interview at any time, but they did not testify that they told him he could stop the questioning, other than during the recitation of his *Miranda* rights. And, during the first interrogation, on August 9, 2019, interrogation, the agent specifically told Naik he could only leave "after this." Under these circumstances, a reasonable person would not believe they were at liberty to refuse to answer questions and leave.

Second, the court must determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." *Hallford*, 756 F. App'x at 6. "Coercive pressures include 'the shock' of being arrested and questioned after being 'yanked from familiar surroundings in the outside world' and 'cut off from his normal life and companions'; 'the hope' that speaking will allow the interviewee 'to leave and go home'; and a reason to think that the interrogating officers have 'authority to affect the duration' of the interviewee's confinement." *Id.* (quoting *Fields*, 565 U.S. at 511–12). While Naik was not formally under arrest, during each interrogation the agents and Naik were alone in a room in a building across the base and away from Naik's familiar surroundings. Further, the agents identified themselves as agents with the Army's Criminal Investigations Division and were armed during each interview. These circumstances provide the same "coercive pressures" as a traditional station house questioning, and the court finds that Naik was in custody during each interrogation and was entitled to *Miranda* protections.

9

**B. Waiver**

Naik argues that his waivers of his *Miranda* rights were involuntary, in part because they were taken after he invoked his right to counsel, and that his waivers were not knowing or intelligent. Naik also argues that his statements were involuntary under the Due Process clause.

1. Legal Standard

The government must prove by a preponderance of the evidence that Naik's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

A waiver is knowing and intelligent if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). But "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). "A court must take into account 'the education, experience and conduct of the accused'—including a defendant's 'alienage and unfamiliarity with the American legal system'—when determining whether a waiver was knowing and intelligent, 'the significance of these factors will be limited to determining whether a defendant knew and understood the warnings that were read to him.'" *United States v. Bourdet*, 477 F. Supp. 2d 164, 183 (D.D.C. 2007) (citing *United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988)).

A waiver is involuntary if the "'defendant's will was overborne' when he gave his statement." *United States v. Murdock*, 667 F.3d 1302, 1305–06 (D.C. Cir. 2012) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Courts should consider, *inter alia,* "the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning." *Id.* The D.C. Circuit has held that "egregious facts

[are] necessary to establish that the statements . . . made during questioning [are] involuntary." *Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016) (quoting *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012)). "Statements made where the circumstances are 'less than 'egregious' are usually voluntary." *Id.* But "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The voluntariness inquiry is the same under *Miranda* and the Due Process Clause. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986).

While a suspect can waive his *Miranda* rights, "special protections apply once the suspect has invoked his constitutional right to counsel during custodial interrogation." *United States v. Straker*, 800 F.3d 570, 622 (D.C. Cir. 2015). A suspect must "unambiguously request counsel" for these protections to apply. *Davis v. United States*, 512 U.S. 452, 459 (1994). In *Davis*, the Supreme Court held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." *Id.*

"Once a suspect asserts the right [to counsel], not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him[.]'" *McNeil v. Wisconsin*, 501 U.S. 171, 176–77 (1991) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). Further, if law enforcement later interrogates the suspect without counsel, those statements are "presumed involuntary" and are therefore inadmissible as substantive evidence at trial. *Id.* at 177. This is true "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards."

11

*Id.* at 177.  This is because "if a suspect believes that he is not capable of undergoing [custodial] questioning without advice of counsel, then it is presumed that any subsequent waiver . . . is itself the product of the 'inherently compelling pressures' [of custodial interrogation] and not the purely voluntary choice of the suspect."  *United States v. Straker*, 800 F.3d 570, 622 (D.C. Cir. 2015) (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)).  The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights."  *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).  Therefore, only when the later questioning is "at the suspect's own instigation" can a court find a valid waiver of *Miranda* rights.  *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (internal quotation marks omitted).

If, however, there is a break in custody between a suspect invoking their right to counsel and the later questioning, then the *Edwards* presumption of involuntariness ends.  *Id.* at 110.  This break in custody, however, must be longer than fourteen days.  *Id.*  The 14-day limitation "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody."  *Id.*

2. August 9, 2019, Statement

The court must first determine whether Naik "unambiguously" invoked his right to counsel.  While he was being advised of his rights before his interrogation on August 9, 2019, Naik asked Agent Richardson, "how can I get a lawyer when I'm here?"  This statement is akin to the one made in *United States v. Allegra*, 187 F. Supp. 3d 918, 924 (7th Cir. 2015), in which the Seventh Circuit held that the defendant had invoked his right to counsel by saying "So can you provide me with an attorney?"  *Id.*  These clear statements—"so can you provide me with an attorney" and "how can I get a lawyer"—are neither ambiguous nor equivocal.

To be sure, "mere suggestions by the suspect that he ought to or may wish to speak to a lawyer, or mere inquiries about the possibility of speaking to a lawyer" are not an unambiguous invocation of the right to counsel. *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 69 (D.D.C. 2017) (collecting cases). In *Abu Khatallah*, the court found that the defendant had not invoked his right to counsel by stating "Is there an attorney here?" *Id.* Here, however, Naik did not only reference a lawyer, but directly asked Agent Richardson "how" he could get a lawyer. A reasonable officer would interpret this as a request for a lawyer—not, as Agent Richardson testified, as a request for legal advice. Moreover, if Agent Richardson viewed Naik's request for counsel as a request for legal advice, she could have stopped the interrogation and allowed Naik to obtain advice from counsel.

Further, after asking how he could get a lawyer, Naik repeatedly asked Agent Richardson to clarify his rights, which Agent Richardson failed to do. Naik first told Agent Richardson, "let me tell you right now ma'am, I cannot afford no lawyers right now because I don't have one." Aug. 9 Video at 12:43 a.m. Agent Richardson responded only "ok." *Id.* When Naik then informed her that he could not afford an attorney, she responded that it was "within his means" to obtain a lawyer. *Id.* at 12:50 a.m. Agent Richardson testified that she meant it was within Naik's "rights," not his "financial means." Hr'g Tr. at 37:19–23 (Testimony of Agent Richardson). But, given that Naik had just said that he could not afford a lawyer, it would have been reasonable for him to infer that Richardson was referring to his financial ability to pay a lawyer, not his right to have a lawyer. When Naik then asked whether he has to get a lawyer, Agent Richardson responded, "that's why I read you your rights," Aug. 9 Video at 12:50 a.m., and therefore refused to clarify or reiterate his right to appointed counsel. When Naik repeated that he could not afford a lawyer, Agent Richardson merely responded "that's kind of why we go

13

over your rights" without clarifying that he was entitled to an appointed lawyer. *Id.* Agent Richardson and Agent Steele not only ignored Naik's initial query about how he could obtain counsel, they then implied that Naik was able to hire his own lawyer. The agents' responses to Naik's questions undermined and contradicted their administration of his rights, especially given that Naik is an Indian national unfamiliar with the U.S. legal system. *Cf. Yunis*, 859 F.2d 953 (explaining "alienage and unfamiliarity with the American legal system" are among the objective factors weighed by the court in deciding whether a waiver is knowing and intelligent).

There is no evidence that Naik instigated the questioning after he invoked his right to counsel. Rather, Agent Richardson told him he could go home "after this," then obtained Naik's consent to search his room and began interrogating him about the events of August 7. Because Naik's statements were made in response to questioning immediately after he invoked his right to counsel, his statements were involuntary. Therefore, the court finds the government questioned Naik on August 9, 2019, in violation of his *Miranda* rights. *See Shatzer*, 559 U.S. at 104. Accordingly, Naik's statements in response to that questioning are inadmissible in the prosecution's case-in-chief.

    3. <u>August 14, 2019, Statement</u>

Naik's next statement was taken just five days later, on August 14, 2019. Because the break in custody was less than 14 days, the *Edwards* presumption of involuntariness continues to apply. *See Shatzer*, 559 U.S. at 104. Again, there is no evidence that Naik instigated the second interview, after he had invoked his right to counsel in the first interview.

The government argues that the court must decide whether the later statements were "sufficiently insulated from the prior constitutional violation as to be considered voluntary." (ECF No. 79 ("Gov't. Surreply") at 5 (citing *Oregon v. Elstad*, 470 U.S. 298 (1985)). In *Elstad*,

14

the Supreme Court held that where officers violated *Miranda* by questioning a defendant without warning him of his rights, but did not otherwise employ coercive tactics, the future investigatory process was not tainted such that a later warned statement must be excluded. *Id.* at 307, 311. But that analysis does not apply where the statement was taken in violation of a suspect's right to counsel under the *Edwards* prophylaxis, which ensures that law enforcement do not "badger" a defendant into waiving his already asserted rights. *Harvey*, 494 U.S. at 350. Therefore, when a suspect invokes his right to counsel, a court must presume that any later waiver of his rights is "itself the product of the 'inherently compelling pressures'" of the custodial interrogation. *Straker*, 800 F.3d at 622 (quoting *Roberson*, 486 U.S. at 681). Therefore, only when the later questioning is "at the suspect's own instigation" can a court find a valid waiver of *Miranda* rights. *Shatzer*, 559 U.S. at 104 (internal quotation marks omitted). The government fails to address this caselaw in its supplemental memorandum (although it does invoke *Shatzer's* 14-day limitation below for the third statement).

As the court noted above, Naik's second interview was five days after his first interview and not at his instigation. Moreover, the Supreme Court has suggested that a sufficient break in custody reduces or eliminates the coercive effects of a rights violation by allowing a suspect "to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Shatzer*, 559 U.S. at104. Here, however, Naik remained on base, and it appears he was not free to return to India while the investigation was ongoing. Hr'g Tr. at 54:22–25 (Testimony of Agent Baral), 86:13–89:14 (Testimony of Agent Zimmerman). Therefore, Naik could not return home to consult with friends and family between the first and second questioning. Nor was he able to consult with a lawyer, as he was never informed how he could get a lawyer on base, despite asking during the first interview.

Therefore, the court finds the government questioned Naik on August 14, 2019, in violation of his *Miranda* rights. *See Shatzer*, 559 U.S. at 104. Accordingly, Naik's statements in response to that questioning are inadmissible in the prosecution's case-in-chief.

4. October 3, 2019, Statement

Naik did not invoke his right to counsel for the October 3, 2019, statement. However, that statement was taken nearly two months after Naik invoked his right to counsel on August 9, so any coercive effects of the first interrogation had worn off, *see id.*, and therefore his waiver is not presumptively involuntary.

The court finds that under the circumstances in which it was given, Naik's October 3 statement was voluntary. The interrogation lasted only twenty minutes, Naik was advised of his rights, and the agent did not engage in any "egregious" conduct during questioning. *Hallford*, 816 F.3d at 863. Naik's waiver of his rights was also knowing and intelligent; his personal background and education show he was capable of understanding what he was doing. Naik also said he understood the rights he was waiving and specifically stated he was willing to talk to the agent without a lawyer. The court therefore finds the government has met its burden to show Naik's waiver was knowing and intelligent on October 3. Because Naik's October 3, 2019, statement was not taken in violation of his *Miranda* rights, it is admissible in the prosecution's case-in-chief.

### III. CONCLUSION

Accordingly, the Court will GRANT in part and DENY in part the motion to suppress. A corresponding Order will issue separately.

Date: February 2, 2020

_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge